Good morning, your honors. May it please the court. I'm Matthew Hoppeck on behalf of the petitioners, Jose Rivera and his family. This is an asylum appeal that involves two separate issues. I'd like to start with the appointments issue first, if possible, and then move on to the merits. To start, we believe the decision from the Board of Immigration Appeals was to the board that has not ever been properly appointed as a board member. The argument starts with the agency's regulations where the attorney general has delegated authority to appoint temporary board members to the EOIR director. That regulation has never been taken off the books. That regulation says that the EOIR director, in his discretion, appoints temporary board members. Here, the temporary board member, I think the Department of Justice, concedes and files in its addendum a copy of the appointment. It was clearly done by the attorney general. What that means is, Mr. Crossett, the staff attorney that wrote the decision, didn't have authority to act on the board's behalf. It would be akin to a staff attorney of this court issuing decisions, writing Eighth Circuit at the top. Just before we even reach the merits, the agency's decision is improper and should be before a board member who has authority to issue decisions on behalf of the agency. There's other proof that Crossett seems to believe that he was appointed by the attorney general. He says so in a footnote of his decision. That's note one on page three of the record. The Supreme Court has spoken to this. Back in the 60s, in McCarty v. Shaughnessy, in that case, the Supreme Court addressed the attorney general taking the authority he had given to the Board of Immigration Appeals to deport people and exerting it himself. The Supreme Court said, once you've delegated that authority to a subordinate, you can't exercise that authority unless you amend the regulation. As a result, the Supreme Court not only reversed the deportation order, but it said that McCarty didn't have to show prejudice. It said that whether he wins or loses on remand, he deserves a fair hearing before the right arbiter. McCarty v. Shaughnessy, even though it's so old, is the only case, the primary case on this point. It addresses the issue of delegation of authority in the regulations. There's a follow-up case from the Supreme Court, U.S. v. Nixon, that applies to McCarty and says that the attorney general can only reassert that authority by amending the regulations. It's certainly easier to ignore the regulation and to appoint staff attorneys without your director being the one to appoint them, but the attorney general has a duty to follow the law. That's our argument about appointments. The second argument is that even if Mr. Crossett was properly appointed, the regulations are quite clear that temporary board members can only serve for six months. While there's a regulation on temporary immigration judges that says those terms are renewable, the temporary board member regulation doesn't say they're renewable. Read together, it would mean that temporary board members can serve for six months, but that they can't just keep being forever renewed as is happening at the agency right now. I think for both reasons, the agency's decision is not a final decision of the Board of Immigration Appeals, that it's not jurisdictionally proper, and that the proper remedy would be to send it back to the agency for an actual board member to adjudicate the appeal. The last thing I want to say is there's a handful of cases on this from the Fifth Circuit and the Seventh Circuit, but none of them have addressed this specific issue except for two unpublished decisions, one from the Fifth and one from the Ninth. It seems because each party hasn't really raised the underlying issue. At least the two published decisions, Brito in the Seventh Circuit and Carrion in the Fifth Circuit, are just factual challenges. They just say, we don't think this guy was reappointed. The department files their evidence that he was reappointed, and then the case goes away because they met their burden. It doesn't seem like those parties had raised this underlying issue that, okay, even if he was reappointed, was that legally allowed, and can the Attorney General appoint board members when his regulation says, or temporary board members when his regulation says that the EOI or director has to be the person appointing them? The only cases on point are the Mboba case in the Fifth Circuit, which is unpublished. In that decision, the court doesn't mention Accardi. It complains that the Department of Justice had relegated the whole issue to a footnote, and then issues its ruling without really explaining why, that it had found in the context of the regulations that the Attorney General can still appoint temporary board members when the regulation on the book says that he can't. The other issue is Andrade v. Chavez, the Ninth Circuit unpublished decision. There, you have to show substantial prejudice to win on this argument. Again, the Ninth Circuit doesn't mention Accardi, which is a Supreme Court decision that says you don't have to show prejudice. The Ninth Circuit doesn't explain why prejudice would necessarily be required. If there's a fundamental issue with the person issuing the decision not having authority to issue it, prejudice is a rule required for violations of regulations that involve the administration of the court or the properly orderly administration of proceedings. When it goes to the fundamental, like who has authority to order me removed, the Supreme Court said in Accardi that he didn't need to show prejudice. Those are my arguments on appointments. Unless you have any questions, I'd like to talk about the merits of the asylum claim. This is a really important case. This is an asylum case that has the elements that you would expect from a bona fide refugee seeking help from the United States. You have a Pentecostal minister who fled El Salvador because he was being persecuted by a criminal organization that controls most of the country. He preached and proselytized to a gang member for about three years until he was finally successful. He pulled the gang member out of the gang, let the man stay in his home, took him into his church. As a result, the gang murdered Ronald and they tried to murder Jose. They followed up by threatening his son after he had fled the country. Jose did what you would expect him to do. He went to the police. Then he went to a local prosecutor. The best advice he got was, we can move you. We can take you somewhere else. They drove him to the border of El Salvador. Naturally, he fled. He came to the United States. First he went to Guatemala. The gang followed him there. Then he came to the United States. What you have in this case is what's missing in a lot of cases. You have a judgment that says what you experienced was persecution. You also have a judgment that says it is more likely than not that you will be tortured if you go back. The dispositive issue, what the board said was dispositive, is the reason, the nexus. What was the reason they were persecuting you? We would submit that the agency just fundamentally gets this wrong. It's just a basic misunderstanding of how religion affects the actions that people that are committed to their faith take. The agency wants to draw this distinction that the gang wasn't mad at you for preaching. They weren't mad at you for your preaching being effective. The agency wasn't mad at you for having a religious belief. They were mad that they lost one of their members. I would submit that those aren't really separable and that the agency, I think, repeatedly gets this issue wrong, especially at the board because the board just doesn't explain the basis for its decision. Counsel, the BIA seems to be drawing a distinction between religious belief and religious practice. Are they entitled to make that interpretation of the term? I don't think they are. They might be with some religions because it would probably differ based on your belief, but Jose testified that his belief motivated his actions. There are churches in El Salvador, he said, that get along with the gangs because they'll do what the gangs say. The gang can sort of have their way and then they'll get along. The judge in his decision mentioned, yes, there are Christian gang members, but Jose testified he couldn't do that because his beliefs wouldn't allow him. He was committed to follow Jesus, he committed to the Bible, and that was what motivated his actions. His actions of preaching and proselytizing and trying to get gang members to come out of the gang were part and parcel of his religious beliefs. I don't think the agency can make that distinction, but I think that's exactly what they're trying to do to erase the religious element. The immigration judge and then the board says, they're not really mad at you for preaching, they're mad at you for taking one of their gang members away, when they're the same thing. You took the gang member away by preaching. There's one more thing I want to mention on this issue, which is separate from, I just think the agency gets it fundamentally wrong, but there's also a factual issue. That is that the immigration judge said that Jose testified that they never tried to stop him from preaching. Then the board, in its decision, affirmed that. They said they never tried to stop you from preaching. That's a factual error. The immigration judge found Jose's testimony credible, and Jose testified at page 145 of the transcript that they told him to stop preaching. Perhaps the agency doesn't have it fundamentally wrong on how religion and actions work. Perhaps they just missed that time the immigration judge got to his analysis. Perhaps he had forgotten that he had already found this gentleman credible, and that Jose had testified that they told him to stop preaching. That issue seems to have really affected both the immigration judge and the board. The board's decision is short, but it's one of the things the board mentions, that they never told you to stop preaching, or they never tried to get you to stop preaching. If that matters so much, then the agency should get the facts right. When you have an agency decision that says, you are more likely than not to be tortured if we send you back to El Salvador, and we have a rigid asylum law that allows protection for this kind of person who flees persecution and is likely to be ... Nobody disputes he's likely to be harmed. They should get it right. It's important. What about the idea, though, that he was able to practice his religion for years without any gang problems, and it wasn't until he encouraged this other person to leave the gang that he began to have problems? What do you make of that? Then the standard, if you mix that in with the standard of review, substantial evidence compels a different conclusion. Can you overcome that? I think that he can for two reasons. One is that the standard for nexus is low. The Malanga case says it's some evidence, and that's following the Supreme Court's decision in INS v. Elias Zacharias. Some evidence is a low standard, but more directly to the first ... Is that our standard? It is Malanga v. Mukasey. This court said some evidence is the standard, and the Supreme Court said so in INS v. Elias Zacharias. It's the standard for our review, not for the BIA. I want to get to your review. This is the second part. I apologize for addressing it in reverse. The question you had asked could be reframed as, what if they only persecute the good preachers, the ones that are effective? Does that really mean that it's not religious-based? They don't go after the preachers that are standing on a street corner, and nobody's listening to them because there's no real reason. Does that mean they're not motivated by your religion? I don't think so. I think there might still be a utility. Our job is to keep people in our gang and up our ranks, but they're still targeting the preacher for the thing he's doing, which is preaching. You make an interesting argument, and I agree with you that there's some overlap here between his beliefs and actions. Any case law that would help us say that you can't disentangle those things like the BIA attempted to do here? The closest case I know of in this court is the DeBrenner case. It's not a religion case. In DeBrenner, it was a case about the Shining Path that had been persecuting people, and the agency said, since they demanded money, this is just an extortion case. It must not be because of your politics. This court reversed. It said that just demanding money wasn't enough to mean that it can't also be because of your politics. I know that's not a great comparison because it's not a religion case, but I don't know of any cases in this court. The Tegegen case, T-G-E-G-E-N, it's not in our brief, but I can file. It's also a political opinion case that is similarly about divorcing one's political opinion from their actions, but I don't know of any cases in this court about religion. Thank you, and I'll reserve the rest of my time. Good morning, and may it please the Court. Edward Wiggers for the Respondent, Attorney General Merrick Garland. Attorney General Garland properly appointed Judge Crossett to hear Petitioner's administrative appeal in this case. The record does not compel the conclusion that Petitioner satisfied the nexus element, and while Petitioners waived their CAT claim by not briefing it to this court, even if the court were to consider it, they do not satisfy the acquiescence requirement for a CAT claim, and the court should deny the petition for review. Starting with Judge Crossett's appointment, 8 U.S.C. 1103-G gives the Attorney General the power to shape the composition of the board, and the Attorney General exercised that power here to appoint Judge Crossett to a new six-month term that began immediately after his first term ended. H.C.F.R. 1003.1-A-4 grants permission to the board, but does not impose an obligation on the E.O.R. director to make temporary appellate immigration judge appointments, and that is what distinguishes that regulation from the matter in Acardi and is the significant point in this case, because in Acardi, the Supreme Court was considering the board's adjudicatory authority as the first-line appellate authority for immigration hearings, and that is a mandatory authority that the Attorney General provided to the board, so the board is obligated under that mandatory regulation to exercise that authority, and in Acardi, what the Attorney General did was he tried to dictate the outcome of the board's adjudication, effectively depriving them of the authority that he gave them, and it wasn't so much that the Attorney General was exercising the authority, the Acardi decision focused on his influencing of the board. In this case, the regulation is permissive. It says the E.O.R. director may appoint a temporary appellate immigration judge for a six-month term, which allows the E.O.R. director to address case flow issues and staffing on an emergency basis, but even as we see here with Judge Crossett's appointment, the Attorney General still made the initial appointment, and that is what moves this case more in line with the Supreme Court's Lucia decision, where it talks about the difference between officers, either principal or inferior, and employees, with officers being subject to the appointments clause. Officers have permanent and continuous duties that involve a significant legal authority. If it's temporary or occasional, then the individual is not an officer. So, with the reappointment of Judge Crossett, he's in line with being an inferior officer for whom the Attorney General must appoint under the appointments clause, and that's what happened in this case. Does the Attorney General have the authority to reappoint for an additional temporary term? Yes, Your Honor. That flows from the broad language of 1003 G1, which gives the Attorney General the authority to adjudicate all immigration matters and to take whatever steps the Attorney General deems necessary to exercise his power for adjudication. Where the Attorney General determines that a temporary appellate immigration judge needs to continue serving to enable the board to function, then the Attorney General can reappoint that temporary appellate immigration judge. As far as Petitioner's argument under Accardi that the regulation should cut off the Attorney General's power, that really comes down to the language. Where the Attorney General is bestowing power on the agency, it uses the shall terms, the mandatory language. We don't have that here in 1003.184. That stems mainly from 28 U.S.C. 510, which talks about how the Attorney General may delegate duties of the Attorney General. 28 U.S.C. 509 talks about how the Attorney General has all duties of every officer, employee, and agency of the Department of Justice. 510 lets him delegate those duties. He did not delegate a duty in 1003.184. Looking at the merits. What's the regulation that states that the Attorney General can appoint temporary judges? It's not in the regulation, Your Honor. It flows from the statute. What's the language that supports that? Is that just the language that the Attorney General can appoint immigration judges or BIA members? The Attorney General shall have such authorities and functions as EOIR had or the Attorney General exercised with respect to EOIR on the day before the effective date of, it should be the Homeland Security Act of 2002, but the statute wasn't updated. Also, he shall establish regulations, prescribe forms, issue instructions, review administrative determinations and immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section. 1103G gives the Attorney General all the authority over immigration proceedings and authorizes him to delegate that authority. When it comes to the question of temporary appellate immigration judges, the broad language of 1103G is what says the Attorney General can do what he needs to do to keep the board running smoothly. If that is reappointing a temporary appellate immigration judge, the Attorney General can do so. But there's no language, let me see if I understand you correctly, there's no statutory language that specifically talks about the appointment of temporary BIA members? No, Your Honor. Nothing specific. Congress is writing in broad swaths to let the Attorney General address issues that may come up. Unless there are any further questions on the appointment of Judge Crossett, I'm going to move to the merits. Counsel, I'll go ahead and dig right into that. I think the issue that this Court has to decide is whether the record compels the conclusion that religion was one central reason for the persecution that Rivera suffered. And so I'd like to refer you to the record at page 219. When the gang members beat Rivera and tried to shoot him, and when they did kill Ronald or Ronald, I think it's two different spellings, they said that, quote, Ronald belonged to them and not to Christ. Why isn't that enough to show that religion was one central reason for the persecution? Because Your Honor, the gang members would not have cared if it were a religious reason for Ronald to leave the gang. He was leaving the gang. And that was their motive for killing him. And that was consistent from Mr. Rivera in both his asylum application where when he's asked if it was because of the church, he's like, no, it was because we were protecting Ronald because Ronald had left the gang. The Supreme Court said in Elias Zacharias that motive is critical and it is the persecutor's motive. If the gang members were targeting Ronald for his religion, that would relate to a persecution claim for Ronald. They were not targeting Mr. Rivera for Mr. Rivera's religion. They were targeting Mr. Rivera because Mr. Rivera harbored Ronald for three years and then got him to leave the gang. Seems like that's a rather narrow construction of the word religion given that he was a pastor and through his efforts, the gang member left the gang and joined the church. This seems to be kind of a trend. I found at least three other circuit court opinions, two of them very recent, one from the Fifth Circuit, the others from the Fourth Circuit, where they held that the BIA was construing the word religion too narrowly and sort of separating beliefs from practices. One of them is the Argueta-Hernandez 87, F-4, 698, 2023 from the Fifth Circuit. The court said if we allow the BIA's analysis to stand, we've run the risk that anything could be characterized as incidental. Why is that not the case here? It's not the case here, Your Honor, because when you look at what actually transpired in this record, it wasn't about religion from the gang's perspective. Because while the gang members did tell Mr. Rivera to stop preaching, he ignored them and they never did anything about it. When this discussion happens in the record, Mr. Rivera has to be led to making the statement that they told him to stop preaching. It's nowhere in his asylum application. It's nowhere in his lengthy declaration. In fact, his attorney first asked him, did you have any confrontations with the gang members, and he says no. What about the quote that I read to you from the record, page 219, that Ronald belongs to them, not to Christ? The key part of that quote, Your Honor, is that they said Ronald belongs to them. That is what they were, that was the basis for their motivation. Ronald was no longer functioning in the gang and that was not acceptable to them. Ronald's reason for not functioning in the gang wasn't germane to the gang. Ronald wasn't functioning in the gang. This case had happened to be because of Ronald's religion. I would point out, Your Honor, that based on the country conditions reports in the records, this case would seem to be more of an outlier in El Salvador when, for example, you have a thousand inmate prison facility where half of them, all of them who were gang members, half of them leave the two major gangs in El Salvador and nothing happens. There's also the country conditions reports that we cite in our brief about the violence conditions shifting around this time frame. I would note that all three of those circuit court opinions involved El Salvador and MS-13 and church workers or pastors. Yes, Your Honor. What those decisions are conflating is the motive of the gang and the motive or characteristics of the victims. The gang's motive here was to keep Ronald in the fold. The fact that it was a religion basis for what Mr. Rivera did and what Ronald did doesn't make it a religious basis for what the gang did. As the Supreme Court points out in Elias Zacharias, just because someone doesn't want to serve with, I believe it was the FARC in that case, doesn't mean that it's a political reason. There could be lots of them. You have to show some evidence of what the gang's motive was. Here, the gang basically came out and said, we're doing this because you left the gang. That's the gang's motive. Is the government conflating one central reason with the predominant reason? No, Your Honor, because the religion here is tangential. If it's tangential, it's not one central reason under the case law. The religion here is tangential because that wasn't why the gang was acting. If the gang had been acting because Ronald was a Christian, which is not what the gang said, but if that were the reason, then there would be a religious angle to what the gang did to Ronald. Your Honor, it's also important to draw a distinction between Ronald and the petitioners because the gang's interactions between the two of them are different. The gang petitioners were essentially targets of opportunity, in part because they were there when the gang killed Ronald. They had a working firearm. They had the opportunity. There was no one else around. They could have killed one or all of the petitioners, and they did not do so. They told them not to report Ronald's murder, and they ran away. Then they reported Ronald's murder when the police arrived two hours later. That's when the gang showed interest in them because they had reported Ronald's murder. What I hear you arguing seems to be the same concern that the Fifth Circuit and Fourth Circuit had between the distinction between beliefs and practices. You're saying they have to have persecuted Ronald because of his faith, not because of his action in leaving the gang and joining the church because of his faith. Yes, Your Honor. That is the distinction because that's the motive. Is the motive just because you left the gang, or is the motive because you're practicing a particular religion? It wasn't because Ronald was a Christian. It was because Ronald left the gang. Ronald happened to leave the gang because he had become a Christian. That makes that tangential to the one central reason of the gang seeking to punish defectors. As far as the particular social group of crime witnesses who make police reports, there is no evidence that they are seen as a distinct segment of Salvadoran society. Petitioner cannot satisfy the social distinction requirement for the particular social group under this Court's precedent in the GUGI. To the extent Petitioner argues that the agency is saying that the gang didn't try to prevent Mr. Rivera from preaching or from practicing his religion, that's simply not true. What the agency said was the gang did not prevent him, and that is what Mr. Rivera said. Mr. Rivera said that they told me to stop preaching in response to counsel's leading question for the second time trying to get to that issue. They told me to stop preaching, but he did not stop. Nothing ever happened to Mr. Rivera. In fact, in his asylum application, Mr. Rivera said that everything was fine until the gang killed Ronald. The key fact for Petitioner, what triggered the gang's animus towards them and the gang's animus towards them is that they killed Ronald for defecting, and that does not bear a nexus to a protected ground. It is subject to the Court's questions. Hearing none, thank you. Mr. Hoppe, your rebuttal. I'd like to start with something my colleague said about this case being an outlier and how there are 50,000 gang members in jail and they get out of jail and nothing happens. That proves our case. It's true that every gang member, once they leave, isn't murdered. If that were true, it would be very hard to prove a nexus. The connection here is that he left and went to the church and that the specific pastor who pulled him out of the gang became the target of their ire. If they were murdering every gang member that left, Mr. Rickards is correct, they don't, then we would have some empirical proof problem that, well, how do you connect your murder to your religion if they're just killing you for leaving the gang? I do think there's, you know, to get back to your first question, Judge Grunder, how do we get past the clear and convincing evidence or the high standard? I think the clearest issue to me, I know the Attorney General now wants to say that that was a misleading question, but there's no real question that the agency missed it, that he did testify that they told him to stop preaching. Why would they tell him to stop preaching if the only motivating factor was that one of their gang members had left? This is before their gang member had left. Then the immigration judge writes in his decision that they never prevented him from preaching. I think at a minimum, we could send it back to the board and say, you know, get the facts right and then apply them once you've figured out the facts. I think below that, there's a really fundamental issue here, which is that the agency, for whatever reason, misconstrues the word religion in the statute to mean religious action, or I'm sorry, religious belief, and then says no asylum for you if they attacked you for religious action because it was just your action and your religion can just sort of be sanitized from it. That's not how the statute works. The statute says religion and religious action is part of that word and not just religious belief. We would ask the court to reverse and thank you.